1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

2

    - - - - - - - - - - - - - - - x
3  THE UNITED STATES OF AMERICA,

                                    Criminal Action No.
4              Plaintiff,          1:21-cr-00604-PLF-1
                                    Monday, December 12, 2022
5  vs.                             9:22 a.m.

6  TYLER SLAEKER,

7              Defendant.
    - - - - - - - - - - - - - - - x

8

9  _____

              TRANSCRIPT OF SENTENCING
10    HELD BEFORE THE HONORABLE PAUL L. FRIEDMAN
              UNITED STATES DISTRICT JUDGE
11 _____

12 APPEARANCES:

13 For the United States:      **BENET KEARNEY, ESQ.**
                               **DOJ-USAO**
14                             One Saint Andrew's Plaza
                               New York, NY 10007
15                             (212) 637-2260
                               benet.kearney@usdoj.gov
16

17 For the Defendant:          **KIMBERLY S. HODDE, ESQ.**
                               40 Music Square East
18                             Nashville, TN 37203
                               (615) 242-4200
19                             kim.hodde@hoddelaw.com

20

    Court Reporter:            Lisa A. Moreira, RDR, CRR
21                             Official Court Reporter
                               U.S. Courthouse, Room 6718
22                             333 Constitution Avenue, NW
                               Washington, DC  20001
23                             (202) 354-3187

24

25

1                          I N D E X

2

   <u>WITNESS</u>                                            <u>PAGE</u>

3

   **ALANNA SLAEKER**

4        (By Ms. Hodde)..................................... 31
         (By Ms. Kearney).................................. 34

5

   **DANIEL SLAEKER**

6        (By Ms. Hodde)..................................... 36
         (By Ms. Kearney).................................. 40

7        (By Ms. Hodde)..................................... 42

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, this is
 3    Criminal Case 21-604, The United States of America vs. Tyler
 4    Slaeker.
 5              Will parties please come forward to the lectern to
 6    identify yourselves for the record, and we'll start with
 7    government counsel this morning.
 8              MS. KEARNEY:  Good morning, Your Honor; Benet
 9    Kearney for the United States.
10              MS. HODDE:  Good morning, Your Honor; Kim Hodde on
11    behalf of the defendant, Tyler Slaeker, who is sitting at
12    defense counsel table beside me.
13              THE COURT:  Good morning.
14              MS. HODDE:  Thank you for having us in person.
15              THE COURT:  Thank you.  Sure.  Just a second.
16              And we have -- I'm sorry, we have Ms. Gavito from
17    probation.
18              THE PROBATION OFFICER:  Yes, Your Honor.  Good
19    morning.
20              THE COURT:  Good morning.  And I think Ms. Schuck
21    is here or will be here from pretrial.
22              So who wants to speak first?
23              Let me just say one thing for the record, and then
24    you can incorporate that, if you want to.  There are --
25    well, I guess what I should do, obviously, before I -- to do
```

1    this in the right order.

2             Under -- this is a -- I'm used to many of the

3    misdemeanors being nonguidelines cases.  This is a

4    guidelines case so let me start with the guidelines.

5             Mr. Slaeker was indicted -- I'm sorry, was charged

6    by information with four misdemeanors.  He pled guilty to

7    Count 1, and part of the agreement is that the government

8    will dismiss the remaining counts.  And Count 1 is a Class A

9    misdemeanor, entering and remaining in a restricted building

10   or grounds, under 18 United States Code Section 1752(a)(1),

11   and the maximum sentence under the statute is one year.

12            The guidelines do apply, and this charge, 18 USC

13   1752(a)(1), is governed by the Guidelines Section 2B2.3.

14   Under 2B2.3 trespass, the base offense level is 4.

15            In this case there is a specific offense

16   characteristic that is added under the guidelines,

17   2B2.3(b)(1)(A).  If the trespass occurred in any restricted

18   building or grounds, then the guidelines are increased two

19   levels.  And that was the case here at the Capitol, so that

20   leads to an offense level of 6.

21            Because Mr. Slaeker accepted responsibility by

22   pleading guilty, there's a two-level downward adjustment to

23   an Offense Level 4.

24            He doesn't have any prior convictions other than

25   some traffic matters, which -- so there are no convictions

1    which count under the guidelines, so he has zero criminal

2    history points.  So that puts him at Offense Level 4,

3    Criminal History Category 1, which means that the guidelines

4    sentencing range is zero to six months.

5          And as everybody knows, the guidelines are

6    advisory.  I don't have to apply them, but in this case it

7    doesn't matter because if I apply -- if I vary downward,

8    that gets me somewhere between zero and six; and if I just

9    applied the guidelines it gets me to zero and six.  So I

10   don't have to worry about a variance.

11         So those are my guideline calculations.

12         Counsel, does either counsel disagree with those

13   calculations?

14         MS. KEARNEY:  No, Your Honor, the government

15   agrees with that calculation.

16         MS. HODDE:  No, Your Honor, on behalf of

17   Mr. Slaeker we have no objection to those guideline

18   calculations.

19         THE COURT REPORTER:  Is there a microphone over

20   there?  If you can just turn it on.

21         THE COURT:  When we get into longer discussions,

22   you can come up to the main microphone.

23         The presentence investigation report prepared by

24   Ms. Gavito beginning on Page 22 has a list of objections.

25   One, I think, by the government, which was dealt with, and

 1    several by the defendant.  And my question is whether there

 2    are any of these objections before we move on to allocuting?

 3              Any of these objections that I need to address or

 4    that we need to discuss this morning specifically?

 5              MS. HODDE:  No, Your Honor.  We don't seek the

 6    Court to make any rulings on the factual clarifications that

 7    we made in the presentence report.  We were just simply

 8    making factual clarifications for the sake of complete

 9    information, but they don't require the Court's ruling.

10    Thank you, though.

11              And also, just for the record, I wanted to let the

12    Court know that Mr. Slaeker has received the presentence

13    report.  We have fully reviewed it line by line, word for

14    word, and that he has received a copy, read it.  We fully

15    discussed it as well.

16              THE COURT:  Thank you.  So everybody agrees there

17    are no further objections, and we can move forward with

18    allocution.

19              So does it make sense for the government to go

20    first and the defense to respond?  I don't know if you two

21    have discussed how you want to proceed.

22              MS. KEARNEY:  We haven't discussed it, but I'm

23    happy to go first.  I think the parties have made their

24    positions clear in their submissions, so there's a few

25    things I'd like to highlight.

```
 1              THE COURT:  Why don't you come to the main podium
 2      and take your mask off so the court reporter can hear you
 3      better.
 4              And so I'll hear from the government, and then
 5      from Ms. Hodde, and then anybody else who wants -- and I'll
 6      hear from probation and from pretrial as well and anybody
 7      else who wants to speak, and then from Mr. Slaeker.
 8              MS. KEARNEY:  Thank you, Your Honor.
 9              And for purposes of what I'd like to say to the
10      Court today, we've included several picture exhibits in our
11      submission, which I assume the Court is familiar with.
12              THE COURT:  Yes.
13              MS. KEARNEY:  If you'd like to see any of them, I
14      do have them on my computer, but I won't bring them unless
15      there's something specific.
16              So I first want to start with kind of the
17      obvious, Your Honor, which is that we're not here today
18      because Mr. Slaeker had any physical contact with law
19      enforcement officers.  We're not here because he destroyed
20      property.  We're not here because he directly participated
21      in violence.  And that is the reason that we are here on a
22      sentencing for a Class A misdemeanor as opposed to a felony.
23              But even though Mr. Slaeker himself did not
24      assault an officer, did not break any property at the
25      Capitol, the evidence in this case nonetheless shows that he
```

1  was prepared to encounter that sort of violence at the

2  Capitol.

3          He wore a helmet --

4          THE COURT:  He says it was a bicycle helmet.  It

5  wasn't any sort of military helmet or anything else like

6  some defendants have in some cases.

7          MS. KEARNEY:  Sure.  I don't think we have any

8  evidence that it was a ballistic-grade helmet, but,

9  nonetheless, he donned protective gear when going to the

10  rally and then to the Capitol indicating that he expected

11  that at the very least he might need protection.  Whether

12  from gunfire or, you know, debris hurled by other

13  individuals I think is of less importance.

14          But he did encounter that violence when he got to

15  the Capitol, and he observed it himself up close.  We know

16  that from his own pictures and his own text messages on

17  January 6th.

18          So we know that when he arrived at the Capitol he

19  encountered outnumbered and overwhelmed law enforcement, and

20  that's clear in Government's Exhibits 16, 17, 18, 19, and

21  frankly in his own Exhibit D, Your Honor.

22          We know he encountered broken windows and doors in

23  Government's Exhibits 16 and 17.  He encountered other

24  rioters breaking apart the scaffolding around the Capitol in

25  Government Exhibit 8, and he encountered others committing

1    violence against law enforcement officers.  He texted his

2    mother that he saw an officer get sprayed and hit with a

3    fire extinguisher.  He saw injured officers.  He took a

4    picture of an officer who he said in the message where he

5    sent it he saw with blood running down his face.

6         And these were not messages, Your Honor, that were

7    sent with dismay, alarm, concern.  There's no recognition

8    here of the humanity of the officers who were the recipients

9    of this violence.  And despite these observations, and

10   despite his recognition of what this was, a violent

11   destructive event, he stayed on the Capitol grounds amidst

12   that violence for at least two and a half hours.

13        THE COURT:  He was in and out of the building

14   itself.

15        MS. KEARNEY:  That's right.  He was in and out of

16   the building for about 15 minutes.  But that, too, Your

17   Honor, is purposeful.  Right?  He was trying to be where the

18   action was.

19        And, you know, despite the observations of

20   violence of destruction of what is really an alarming

21   overwhelming event for law enforcement, he joked to multiple

22   people that he was taking a self-guided tour.

23        THE COURT:  Say that again.

24        MS. KEARNEY:  He joked to multiple people that he

25   was taking a self-guided tour of the Capitol.  Right?

1          This wasn't someone who saw this and registered

2   concern or dismay about what was happening.  This was

3   someone who saw this and flippantly joked that he was on a

4   Capitol tour.  And, in fact, he told one other individual

5   that he thought it was beautiful.

6          And so that's one reason, Your Honor, for the

7   government's recommendation of three months, which is in the

8   midpoint of the guideline range that you just calculated.

9          The other is the defendant's conduct following

10  January 6th.  You know, the defendant's submission and his

11  letters of support talk about his conduct that day as an

12  aberration, as a momentary lapse in judgment.  And I think

13  it's true that he probably never illegally entered the

14  Capitol building before.

15         But it's clear from his words and from his actions

16  during that event and following that event that this is not

17  a defendant who is attempting to distance himself from his

18  conduct that day, to make amends for his conduct that day,

19  to put it behind him.  And, in fact, what's clear, Your

20  Honor, is he's proud of what he did.

21         As I just said, in the days following January 6th

22  he texted another individual that he found the riot

23  beautiful.  He expressed no regret and joked that he was on

24  a self-guided tour.  And he laughed at a meme that was sent

25  to him that attempted to make light of the breach by turning

1    it into a toy, a Lego set of the breach of the Capitol.  And

2    that's coming in the days immediately following January 6th.

3              A lot of time has passed since then, Your Honor,

4    and a lot of time has allowed things to, perhaps, cool,

5    perhaps for Mr. Slaeker to put himself in a different state

6    of mind.  But that hasn't happened either.

7              More recently he celebrated the anniversary of

8    January 6th by baking a cake with his children that was a

9    model of the Capitol and by sharing pictures of it online.

10   And when the media found this picture, Your Honor, he

11   doubled down.  He said, "Thanks for stopping by, NBC."  He

12   didn't say, "That was a mistake.  I shouldn't have posted

13   that."  He kept it up and was proud of it.

14             And he's also made comments predicting and

15   condoning civil war, comparing January 6th to the Boston Tea

16   Party, a glorious day.

17             And so what's clear, Your Honor, is that this is a

18   defendant who feels justified in what he did on January 6th

19   and would do so again when faced with a political outcome

20   that he doesn't agree with.

21             Far from being remorseful, this defendant has

22   revelled in his criminal conduct.  And I think, Your Honor,

23   that that is also reflected in this defendant's attitude

24   towards the criminal process and the supervision of this

25   Court.  He has, as documented in the presentence report,

1    refused to submit to the basic terms of supervision.  And as

2    documented in our submission, Your Honor, he's posted online

3    about using the discovery materials in this criminal case,

4    which are subject to a protective order, for his own

5    purposes.

6              THE COURT:  What is that all about?

7              MS. KEARNEY:  It's on Pages 27 and 28, Your Honor.

8    He posted online, "I am a Jan 6 defendant.  I only have

9    access to discovery for a limited time.  What questions need

10   answers?  What should I spend my time investigating?"

11             So this is someone who has offered to the Internet

12   to use his access to sensitive materials, including those

13   designated as highly sensitive -- so, for example, Capitol

14   Police surveillance footage -- to investigate, and I'm using

15   that term in quotes, Your Honor, for others.

16             And so his refusal to recognize the basic

17   principles that govern this criminal case -- the requirement

18   that he be supervised by pretrial, the requirement that he

19   adhere to a protective order when given the discovery that

20   is due to him under the Federal Rules -- indicates his lack

21   of respect for law and authority with which he does not

22   agree.  And that, Your Honor, is concerning for this

23   defendant's conduct going forward.

24             And so for those reasons, Your Honor, we submit

25   that a term of three months of imprisonment followed by a

1    term of a year of supervised release, 60 hours of community

2    service, and the $500 in restitution that is contained in

3    the plea agreement is the appropriate sentence.

4            THE COURT:  I want to ask you about two other

5    things which you didn't mention here but are in your brief.

6            There were some things that occurred, as I recall

7    from your brief -- and it may also have been in the

8    presentence report about after the FBI search of Mar-a-Lago.

9    There were certain things that Mr. Slaeker did or said.

10           MS. KEARNEY:  He posted on an Internet forum, Your

11   Honor, calling -- basically predicting that there would be

12   civil war and stating that he was -- so another user, Your

13   Honor, had commented using the phrase "lock and load" in

14   reference to a firearm and ammunition, and Mr. Slaeker

15   asked, "Are we not in a civil war?"  Which, you know, as I

16   think as I mentioned, Your Honor, indicates the mindset with

17   which he approaches kind of disagreement, right?

18           So what I gather, Your Honor, is that he feels

19   that the search at Mar-a-Lago was not justified or not

20   supported or --

21           THE COURT:  Well, probably there's lots of people

22   who felt that way.

23           MS. KEARNEY:  Correct.  And, look, I'm not saying

24   that he should be punished for that belief.  What I'm saying

25   is that's what's concerning, is that his response to

1    thinking that something was unfair or unjust is to call for

2    violence and to predict violence.

3            And this is something that he said while charged

4    in this case, while awaiting sentencing.  As he himself

5    noted, "I'm awaiting sentencing for trespassing in the

6    Capitol.  I am being careful with my words."  So this

7    reference to a civil war is the moderated version of what he

8    wanted to say.

9            THE COURT:  So I assume you've read the portions

10   of both the probation office -- I'm sure everybody's read

11   everything -- probation report and the series of reports

12   from Pretrial Services, and how confident are you that the

13   orders of the Court to get guns out of his residence has

14   actually happened?

15           MS. KEARNEY:  I don't know, Your Honor, and I

16   defer to pretrial on that.

17           I'm aware of the back-and-forth and Mr. Slaeker's

18   kind of refusal to account for his firearms and to turn them

19   over to the supervising -- or rather to clear them from his

20   home before being supervised by pretrial.  I don't have any

21   additional information either way, and so I defer to

22   pretrial on that question.

23           THE COURT:  Okay.

24           All right.  Thank you.

25           MS. KEARNEY:  Thank you, Your Honor.

1          THE COURT:  Ms. Hodde.

2          MS. HODDE:  Your Honor, Kim Hodde.  Thank you very

3    much for having me today.

4          I didn't know if the Court would consider allowing

5    Mr. Slaeker to allocute and then allow me to make my

6    argument to the Court?

7          THE COURT:  Well, that's fine with me.  I do want

8    to hear from probation and pretrial.

9          MS. HODDE:  I'll do whatever the Court would like

10   for me to do.

11         THE COURT:  I mean, I'm happy to hear from him

12   before I hear from you, but I think I'd like to hear if

13   probation wants to say anything or pretrial wants to say

14   anything.

15         MS. HODDE:  Would you like to hear from probation

16   and pretrial before you hear from --

17         THE COURT:  Yes.

18         MS. HODDE:  Thank you.

19         THE COURT:  I was going to do it after you and

20   before Mr. Slaeker, but if you want Mr. Slaeker first, I'll

21   hear from them and then Mr. Slaeker.

22         MS. HODDE:  Thank you, Your Honor.

23         THE COURT:  Ms. Gavito.

24         THE PROBATION OFFICER:  Thank you, Judge.  And

25   with regards to probation, Your Honor, we did, as the Court

1   is aware, make a recommendation for three years of

2   probation.

3            THE COURT:  Get a little closer to the mic.

4            THE PROBATION OFFICER:  As the Court is aware, we

5   did make a recommendation for three years probation.  And as

6   part of the discretionary or standard conditions of

7   probation as well as a special condition, we would ask the

8   Court to impose a condition that the defendant not own,

9   possess, or have access to firearms during those three

10  years.

11           THE COURT:  Thank you.

12           THE PROBATION OFFICER:  Anything else, Your Honor?

13           Thank you, Judge.

14           THE COURT:  Ms. Schuck from pretrial?

15           PRETRIAL SERVICES:  Good morning, Your Honor;

16  Christine Schuck, Pretrial Services.  Pretrial Services

17  stands by the report that we submitted --

18           THE COURT:  Would you mind taking your mask off

19  just briefly?

20           PRETRIAL SERVICES:  No problem, Your Honor.

21           Pretrial Services stands by the report that we

22  submitted.  If Pretrial -- if the Court has any specific

23  questions for Pretrial in regards to what was in that report

24  in regards to the firearms or anything, we're happy to

25  answer any questions.

1          THE COURT:  Well, I read again the June 9, '22,

2    report, Docket 43, and then the most recent report of

3    December 9th back at 54, and I'm concerned about where

4    things stand on the firearms and whether there's any

5    confidence that he's no longer in possession of the firearms

6    or has access to firearms.

7          The issue first came up when he was living in

8    Washington state, and then there's something in your report

9    about how pretrial in Tennessee won't go to the home because

10   they're concerned about their safety, if I'm reading it

11   right.

12         PRETRIAL SERVICES:  That is correct, Your Honor.

13         So after -- with everything that happened in

14   Washington, when we transferred supervision to the Middle

15   District of Tennessee, Tennessee, for officer safety, was

16   not going to be conducting home visits because they did not

17   have assurances that the firearms were not brought with

18   Mr. Slaeker from Washington to Tennessee.

19         And then on November 19th, when Officer Haney did

20   his orientation, he specifically told Officer Haney he does

21   not want home visits conducted.

22         So given all that, the Middle District of

23   Tennessee has not been doing home visits for --

24         THE COURT:  So Mr. Slaeker said he didn't want

25   them to come to the home?

1        PRETRIAL SERVICES:  That is correct.

2        THE COURT:  So if I put him on probation, is he

3   going to tell probation the same thing?

4        PRETRIAL SERVICES:  And he also would not allow a

5   full home inspection up in Washington state when they tried

6   to do it.  When Officer Acker was attempting to do it, he

7   would not allow them to go through the home to do a home

8   assessment.

9        So in Washington state, he would not allow a full

10  home assessment, and when he got to Middle District of

11  Tennessee, he told Officer Haney I do not want home visits

12  done.

13       So Pretrial Services cannot say with confidence

14  that this condition has been adhered to because home visits

15  have not been conducted.

16       THE COURT:  All right.  Thank you.

17       PRETRIAL SERVICES:  Thank you, Your Honor.

18       THE COURT:  Ms. Hodde.

19       MS. HODDE:  Your Honor, I would like for

20  Mr. Slaeker to allocute before I address the Court, but I

21  do -- because this seems to be a prompt issue that we just

22  need to take up, I would like to address quickly the

23  firearms and Pretrial Services' supervision issue.

24       The Court will recall that Mr. Slaeker was

25  originally represented by the federal public defender in

1    Washington state where he originally resided, and then in

2    November of 2021 he moved to Nashville -- to a suburb of

3    Nashville, Tennessee; and Ms. Wellman, who previously

4    represented him, withdrew from the case, and I was appointed

5    to begin my representation of Mr. Slaeker.

6         And, I mean, absolutely I'm casting no blame on

7    Ms. Wellman, and I mean no disrespect to her in any regard,

8    but Mr. Slaeker and Ms. Wellman didn't communicate well.  It

9    was clear to me very early on in my representation of

10   Mr. Slaeker that there were challenges internally in the

11   relationship that I think were contributing to a few things.

12        The Court will note that Mr. Slaeker has had no

13   Pretrial Services issues since I began my representation --

14        THE COURT:  We don't know that because he won't

15   let them inside the house.

16        MS. HODDE:  Well, I disagree with the

17   representation on that.  When I got onboard in this case, I

18   immediately contacted Ms. Haney.  I emailed probation.  I

19   have alerted the office that I want to make sure that we are

20   meeting every expectation that probation needs in this case.

21   I sent emails.  I had personal conversations both with

22   Ms. Haney and then with Mr. Sutton, who later supervised --

23   Ms. Haney ended up transferring off the case and supervision

24   ended up being transferred to Cody Sutton later in the

25   period of pretrial supervision.

1          I have repeatedly offered for them to do home

2     inspections.  I've asked them to do home inspections.  And

3     they have told me -- what I was told in December of 2021 is

4     we were told not to do a home inspection at this point

5     because of the concern about firearms being in the home for

6     officer safety reasons, very understandably.

7          And I assured them that Mr. Slaeker had

8     transferred -- based on his representations to me, of

9     course; I don't have personal knowledge --

10          THE COURT:  Well, one way to determine it is to

11     let them go to the home and check.

12          MS. HODDE:  Absolutely.

13          THE COURT:  So let's do that before we sentence

14     him.  Because otherwise it seems to me he's going to be back

15     here with gun problems or some other problem, if I put him

16     on probation.  And it may make more sense just to send him

17     to jail for 30, 45 days and then cut him loose, if he wants

18     to have guns in his home.  You know, otherwise he's going to

19     be on probation for three years, and we're going to be back

20     and forth to this courtroom.  I'm absolutely confident we're

21     going to be back and forth to this courtroom with him having

22     violated that condition or perhaps others in addition to the

23     other arguments that the government has made that need to be

24     addressed.

25          But, you know, one way to deal with it is, you

1   know, 45 days in jail, no supervision, and then nobody has

2   to come into his home that he doesn't want into his home.

3          MS. HODDE:  Your Honor, I respect the Court's

4   concerns on this issue.  I would suggest to the Court

5   that we have repeatedly invited probation into the home.

6   Mr. Slaeker is willing -- if the Court would like to

7   postpone the sentencing and have a home inspection, we are

8   happy to do that.

9          Mr. Slaeker has transferred all firearms out of

10  his home.  He did that in November -- he did that prior to

11  my representation of him, is what I should say.  He's

12  transferred them to his mother, who now lawfully owns those

13  firearms.

14         There are no firearms or weapons in his home, and

15  I've been very meticulous in my explanations to him about

16  the reason that we do these things is for officer safety.

17  It's incredibly important that we protect our probation

18  officers and that they can feel like they can always go into

19  a home and they don't have to worry about those things.

20         And so, anyway, I just wanted to make sure that

21  the Court understands that Mr. Slaeker fully understands why

22  that is an important rule.  He is in compliance.  And we --

23  I have personally repeatedly invited U.S. Probation to do

24  home inspections.  And so I just wanted to set the record

25  straight on that.

1           And if the Court would like to postpone so that we

2     can do a home inspection, I would certainly be happy to do

3     that.

4           I do have a lot of things to say about the

5     sentencing today, if the Court goes forward, because I think

6     that some things need to be placed in context.  I have a

7     different view of Mr. Slaeker that I would like to share

8     with the Court.

9           THE COURT:  Well, the most recent presentence

10    report on Page 2 near the top of the page does say that

11    Mr. Sutton assumed supervision.  He made several attempts to

12    reach the defendant by telephone, text message, and email.

13    Did not receive a response.

14          On June 8, 2022, after defense counsel intervened,

15    the defendant contacted USPO Sutton.  The defendant

16    acknowledged receiving USPO Sutton's voice mail on 5/26/2022

17    and the letter advising USPO Sutton was his new supervision

18    officer.

19          The defendant stated he did not respond to USPO

20    Sutton because he did not see the need to as everything

21    being related to him were things he already knew.  The

22    defendant informed USPO Sutton he intended on calling that

23    day, June 8, 2022, and said he was unable to take USPO

24    Sutton's on June 7, 2022, because he was at his children's

25    sporting event.

1        Between July 11, 2022, and November 7, '22, this

2   officer maintained regular contact -- that's Ms. Schuck --

3   with USPO Sutton and was advised there were no issues or

4   concerns with the defendant.  The defendant has continued to

5   report as directed.  There are no issues or concerns.

6        But there still has not been a home visit, as I

7   understand it.

8        MS. HODDE:  Yes, Your Honor.  And when I

9   received -- so just for context -- and remember, I

10  explained, I think, this to the Court at the time we did the

11  plea because it was very fresh.  I think it was around the

12  time that we did the plea.  I think we did the plea on June

13  the 10th or so, if my memory is serving me correctly.

14       I had started a trial, a three-and-a-half-month

15  trial in the Middle District of Tennessee on June 1st, and

16  the Court was kind enough to accommodate me, because we were

17  taking Fridays off during periods of the trial, and so I was

18  able to do the plea by video on a Friday.

19       When I received this report by Mr. Sutton, I

20  was sitting in the courtroom, and I happened to see my

21  email that Mr. Sutton was having difficulties reaching

22  Mr. Slaeker.  I immediately asked -- by email asked my

23  office to reach Mr. Slaeker, and they got him on the phone

24  in an instance, and Mr. Sutton talked to him

25  instantaneously.

1    I spoke to Mr. Sutton about this.  I welcomed

2    having a meeting in person to discuss it because in my

3    district we work hard to work together with probation, as

4    we all should to make the system work correctly, and I

5    think that there have been very few miscommunications with

6    Mr. Sutton or issues.  I have had to -- you know, I've asked

7    that I be copied on the communications between them.

8    I've, you know, personally requested that my

9    client engage in conversation with Mr. Sutton volunteering

10   "Is there anything that you need from me?" you know, without

11   being prompted since that time, and he has done that, and

12   he's copied me on those communications.

13   So we've tried to be overly compliant, you know,

14   in this period of time.

15   I just wanted to tell the Court, I feel like -- I

16   understand the Court's concerns.  I completely understand

17   the Court's concerns and the perspective that the Court has,

18   and agree that obviously we need home inspections, and we

19   need to be sure that officers are safe when they do it.

20   I am very comfortable representing to the Court

21   that we can do a home inspection today without incident.

22   I'm also very confident that Mr. Slaeker has no firearms.

23   I mean, he has repeatedly assured me of that.

24   I've spoken with the individual who possesses the firearms

25   who has assured me that they have them, that they're not in

1    his home anymore.

2          So just as an officer of the court, I will proffer

3    that into the record.

4          THE COURT:  So you've spoken -- you're confident

5    the firearms are with who?  His mother or his father?

6          MS. HODDE:  They are.  In fact, Your Honor, for

7    the record, today present in the courtroom are Alanna

8    Slaeker, the woman on the far right -- that's his wife --

9    his mother, Benita Slaeker, and his father, Dan Slaeker.

10         His mother and father are the ones who now possess

11   the firearms.  They've been transferred into his custody and

12   control, and they are no longer in Mr. Slaeker's residence.

13   And if the Court would like to hear from them under oath to

14   swear to those things, they will be glad to testify to those

15   things to the Court that those things have happened, if that

16   will assuage any of the concerns.

17         THE COURT:  I think that would be helpful.  Each

18   of them can -- I'll let you talk to them, if they wish to.

19   They can come up.  We don't have to put them on the witness

20   stand; they can stand here.  But they can be sworn in, and

21   they can testify to those things, if that's what you and

22   they would like to do.

23         I mean, I won't force them to testify under oath

24   if they don't want to for any reason, but they're certainly

25   welcome to, and that might alleviate some of my concerns.

 1            Do you want to take a little break to talk to

 2    them?

 3            MS. HODDE:  I would be happy to.  Thank you, Your

 4    Honor.

 5            THE COURT:  And before you do that, let me ask

 6    both Ms. Gavito and Ms. Schuck if they have anything more

 7    they want to say on this issue before we take a short break?

 8            THE PROBATION OFFICER:  Your Honor, if the Court

 9    will take the defendant's parents' testimony as to the

10    firearms, we would be happy to take that at face value, if

11    they're willing to swear under oath that they have removed

12    the firearms.

13            And if there is a way that the defendant can

14    provide -- I know that there was a point where pretrial

15    wanted a --

16            THE COURT:  Documentation of some sort.

17            THE PROBATION OFFICER:  -- document of the types

18    of firearms that he transferred.  And if he can provide that

19    to the Court as well as the testimony, then we would be --

20    we would be happy with that.

21            THE COURT:  Again, my recollection, having read

22    the documents, is -- having read the filings here is that

23    that documentation never was provided.  It was supposed to

24    have been provided.

25            THE PROBATION OFFICER:  Right.  There was a lack

1     of documentation.  I think that there was something signed,

2     but it didn't enumerate.

3             And I don't want to speak on behalf of pretrial,

4     but I believe that there was an issue with not listing the

5     firearms that had been transferred, if I'm representing that

6     correctly.

7             THE COURT:  Ms. Schuck?

8             PRETRIAL SERVICES:  Probation is correct.  When

9     the form -- and Your Honor actually pointed it out during

10    the hearing that we had, that the form was finally filled

11    out.  But he only checked off that the firearms had been

12    transferred; he did not list what firearms had been

13    transferred.

14            And pretrial will also note, I did actually review

15    the email that was sent by defense counsel to Officer Haney

16    back in December of 2021, and it only spoke about requesting

17    the amending of the release conditions to allow Mr. Slaeker

18    to have firearms, not to have actually a home visit

19    conducted.

20            So there's been nothing about having a home visit,

21    and I cannot guarantee that, even if I was to make a call

22    today to the Middle District of Tennessee, that they would

23    be willing to do a home visit at this point.  I can't

24    guarantee that it would be able -- you know, they would have

25    the manpower to do one today, or if they would be willing to

```
 1      do one at this point for officer safety reasons.
 2              THE COURT:  Okay.  Well, let me suggest the
 3      following.  Why don't we take a short break.  Ms. Hodde can
 4      speak with Mr. Slaeker's parents and his wife about whether
 5      they would like to testify under oath and maybe also discuss
 6      the documentation question, and they can also discuss it --
 7      she can also discuss it with you, as long as you're here,
 8      Ms. Schuck, about what we've been waiting for and don't yet
 9      have, although it seems clear.
10              And it may be that working on the issue of a home
11      visit and the firearms question is all we can accomplish
12      today, and we may have to come back for the sentencing.  I
13      mean, if I'm seriously going to consider an alternative to
14      incarceration, we may have to hear from people today on the
15      firearms question and get the requisite documentation on the
16      home visit before we proceed to sentencing.
17              So those are my thoughts at the moment.  I'm happy
18      to hear from anybody on that when we come back in 10 or 15
19      minutes.
20              (Recess taken)
21              THE COURT:  Okay.  So, Ms. Hodde, how would you
22      like to proceed?
23              MS. HODDE:  Your Honor, what I would like to do is
24      to propose two things.
25              One is to advance sworn testimony by individuals
```

1    who are here in the courtroom today who do have direct

2    knowledge about the firearm transfer.  I think that that may

3    assuage some of the Court's concerns.

4            And then second to that, I've talked to probation

5    during the break as well.  And we would be agreeable, after

6    the Court hears that testimony -- if the Court's satisfied

7    with the firearm transfer, then I would propose adding some

8    supervisory language that would be consistent with the

9    language that the officers in my district are used to

10   executing on, and it basically would be a search condition

11   as part of home visits.

12           And in my district, we typically defer to the

13   discretion of the supervising officer about the need to

14   conduct searches, whether to schedule them on a certain --

15           THE COURT:  No.  No, no, no, no, I'm not doing

16   that.  I'm not doing that.

17           I mean, I do not trust him.  I do not trust him

18   not to have firearms.  I do not -- he has shown no -- we're

19   not going to have sentencing today by the way.  He has shown

20   no regard for the rules and regulations.  And I am very

21   reluctant to put him on probation for a whole variety of

22   reasons, but I'm not going to tailor it.

23           And the probation office has recommended that I

24   transfer -- if I do put him on probation that I transfer

25   supervision and jurisdiction to Tennessee.  I'm not

1    transferring jurisdiction.  I'm keeping jurisdiction.  If

2    there are any violations of his conditions, if I put him on

3    probation or if I sentence him to jail and have a term of

4    supervised release, if there are any violations whatsoever,

5    we will be back here.  He will not be before a judge in

6    Tennessee, which is why I said, you know, another

7    alternative is 30 or 45 days in jail, and then no

8    supervision, and then he can do whatever he wants to do.

9         But as long as I've got this case, I am going to

10   watch him like a hawk; put him on supervision or probation.

11   No other judge is.

12        And I'm not deferring to pretrial or probation.

13   I'm just not.  He hasn't earned that.

14        So today we'll deal with the firearms issue to be

15   followed by full documentation consistent with what was

16   asked for to begin with, and we'll have sentencing on

17   another day.

18        MS. HODDE:  Thank you, Your Honor.

19        Would the Court like to hear from the witnesses at

20   this point?

21        THE COURT:  Yes, and they will be under oath.  We

22   can put them on the witness stand, if that's easier for

23   everybody.

24        MS. HODDE:  Your Honor, I would start by calling

25   Alanna Slaeker.  That is Mr. Slaeker's wife.

```
 1              THE COURT:  Good morning.
 2              THE WITNESS:  Good morning, Your Honor.
 3              THE COURT:  So calm down.  And I've read your
 4    letter so I'm familiar with you, but this -- we want to talk
 5    to you this morning about a very narrow question.
 6              So do you want to inquire?
 7              MS. HODDE:  I would be happy to do a very brief
 8    direct, if that would be helpful --
 9              THE COURT:  I think it would.
10              MS. HODDE:  -- to lay some foundation.
11                     ALANNA SLAEKER, Sworn
12                       DIRECT EXAMINATION
13    BY MS. HODDE:
14    Q.  Good morning, Ms. Slaeker.  For the record, you are the
15    defendant's -- Tyler Slaeker -- wife, correct?
16    A.  Yes, ma'am.
17    Q.  And you all now live together in Fairview, Tennessee; is
18    that right?
19    A.  Yes.
20    Q.  And that's a suburb of Nashville; is that correct?
21    A.  Yes, ma'am.
22              THE COURT:  Is this microphone on, Mark?
23    Q.  And when Mr. Slaeker was first arrested, he was arrested
24    at your home; is that right?
25    A.  Yes.
```

1    Q.  And that was when you lived in a suburb of Washington

2    state -- of Seattle and Washington state; is that right?

3    A.  Yes.

4    Q.  And that was -- do you remember what month that was in

5    in 2021?

6    A.  I think it was August.

7    Q.  Okay.  And at some point, I believe it might have been

8    around September of 2021 or early October of 2021, did you

9    possess -- your family possess firearms in the home?

10   A.  No.

11   Q.  Did you previously possess firearms in the home that you

12   transferred to Mr. Slaeker's parents, Dan and Benita

13   Slaeker?

14   A.  Yes.

15   Q.  Okay.  And I'm going to list the firearms for the record

16   and ask you if you're aware that that particular firearm was

17   transferred.  Okay?

18   A.  Okay.

19   Q.  And there was a Kimber 308 pistol; is that right?

20   A.  Yes.

21   Q.  And was that transferred to Mr. Slaeker's parents around

22   September or October of 2021?

23   A.  Yes.

24   Q.  I realize you don't know an exact date.

25   A.  Yes.  I'm sorry.  We were moving so it's -- everything

1    was going everywhere.

2              THE COURT:  Is that when you were in the midst of

3    moving from Washington state to Tennessee?

4              THE WITNESS:  Yes.  Yes, sir.

5              THE COURT:  And did you move because of your job?

6              THE WITNESS:  No.  We wanted to buy land and so,

7    with our large family, Tennessee seemed like a good fit for

8    us.

9              THE COURT:  Okay.

10   Q.  A little more affordable?

11   A.  Yes.

12   Q.  And there was a second firearm that was also transferred

13   that was a Springfield nine-millimeter pistol; is that

14   correct?

15   A.  Yes.

16   Q.  And a third firearm was a Mossberg 12 Gauge shotgun; is

17   that correct?

18   A.  Yes.

19   Q.  And a fourth firearm, a Colt 223 rifle; is that correct?

20   A.  Yes.

21   Q.  And the last firearm was a 17 HMR rifle; is that

22   correct?

23   A.  Yes.

24   Q.  And that was the extent -- the five firearms I just

25   listed, that is the total firearms that existed in you all's

1    home or in Mr. Slaeker's possession; is that correct?

2    A.  Yes.

3    Q.  And he does not have any firearms anymore, in the house

4    or in any other place?

5    A.  No.

6    Q.  And those firearms were transferred, in fact, fairly

7    shortly after the arrest, correct?

8    A.  Yes.

9           MS. HODDE:  Your Honor, I don't know if the Court

10   has any other questions.  I think those are the questions

11   that I wanted to establish on the record.

12          THE COURT:  Okay.  Well, I'll ask Ms. Kearney if

13   she wants to ask any questions.

14          MS. KEARNEY:  Thank you, Your Honor.

15                      CROSS-EXAMINATION

16   BY MS. KEARNEY:

17   Q.  I do have to confess I'm from New York so I don't have

18   all those spellings down, but we'll see what I can do.

19          I just wanted to confirm, Mrs. Slaeker.  Prior to

20   your husband's arrest, how many firearms did he have in the

21   home?

22   A.  Five.

23   Q.  Okay.  And did he keep firearms in a car or in a storage

24   unit anywhere else that you know of?

25   A.  No.

1    Q.   Okay.  And you said these were -- these five were

2    transferred to his parents in September or October of 2021?

3    A.   Yes.

4    Q.   Okay.  How do you know they were transferred?

5    A.   Because I saw that he did it.  It was before the home

6    visit that was going to come, I remember.  And so he took

7    them to his parents.

8    Q.   Did you go with him?

9    A.   No.  I stayed with the kids, but I saw him leave with

10   all of them to his parents house.

11   Q.   Okay.  And does he -- do you or your husband maintain

12   any paperwork regarding these firearms?

13   A.   I don't know.

14   Q.   Are you familiar with kind of makes and models of

15   firearms?

16   A.   No, but I know what -- I know that we have the five, and

17   so I know that when we've gone like practice shooting and

18   he's told me which is which, and so I kind of remember the

19   key things.

20          Like you were saying you don't remember all of the

21   vocabulary, but I remember like, okay, these are the rifles.

22   This is the shotgun.  This is the Kimber.  Like I remember

23   keywords of the five.

24   Q.   Okay.  So you know there was a rifle.  You know there

25   was a shotgun.  And then the other details --

```
 1    A.  Yes, yes, like the numbers and -- but I know the

 2    keywords.

 3    Q.  Okay.  And you said you and your husband would go

 4    shooting together sometimes?

 5    A.  Uh-huh.

 6    Q.  Okay.  Have you gone shooting together since his arrest?

 7    A.  No.

 8            MS. KEARNEY:  I don't think I have any further

 9    questions, Your Honor.

10            THE COURT:  Thank you.

11            Thank you very much, Mrs. Slaeker.

12            THE WITNESS:  Thank you, Your Honor.

13            MS. HODDE:  Your Honor, I would next call Dan

14    Slaeker, Mr. Slaeker's father, who is present in the

15    courtroom again today.

16            THE COURT:  Come on up, sir.  Good morning.

17            THE WITNESS:  Good morning.

18                    DANIEL SLAEKER, Sworn

19                     DIRECT EXAMINATION

20    BY MS. HODDE:

21    Q.  Good morning, Mr. Slaeker.

22    A.  Good morning.

23            MS. HODDE:  Your Honor, I'm going to do the same

24    thing.  I'm going to lead, with the Court's permission, just

25    to accelerate through things.
```

1          THE COURT:  Absolutely.

2     Q.  Your name is Dan Slaeker, and you are Tyler Slaeker's --

3     the defendant -- father; is that correct?

4     A.  That's correct.

5     Q.  And you're married to Ms. Benita Slaeker, Mr. Slaeker's

6     mother; is that right?

7     A.  Yes.

8     Q.  And during the time that Alanna and Tyler Slaeker lived

9     in Washington, you also lived in Washington fairly close by;

10    is that fair enough?

11    A.  Yes.  That's correct.

12    Q.  And after Mr. Slaeker's arrest -- do you remember when

13    Mr. Slaeker was arrested?

14    A.  Only from what Alanna just said.  It must have been

15    August, but I don't really recall, no.

16    Q.  And at some point after Mr. Slaeker's arrest did he make

17    you aware that firearms needed to be removed from his home?

18    A.  Yes, he did.

19    Q.  And did he ask you all if you would be willing to take

20    possession and ownership of those firearms?

21    A.  Yes.

22    Q.  And did you, in fact, take possession and ownership of

23    the firearms that had previously been present in Tyler and

24    Alanna Slaeker's home?

25    A.  Yes, we did.

1    Q.  And did you hear me list the five firearms when

2    Mrs. Slaeker testified?  You were in the courtroom for that

3    testimony, correct?

4    A.  Yes.

5    Q.  And did you hear me list the five firearms for Alanna

6    Slaeker?

7    A.  Yes.

8    Q.  And are those, in fact, the five firearms that you and

9    your wife took possession of?

10   A.  I am not certain that the names are the same, but I took

11   possession of five firearms.  They were pistols and the

12   rifles and the shot -- the rifle and the shotgun.  But

13   actual brands and all that, I couldn't.

14          THE COURT:  But there were five?

15          THE WITNESS:  There were five, yes.

16   BY MS. HODDE:

17   Q.  And Mr. Slaeker delivered those to you, correct?

18   A.  Yes, yes.

19   Q.  And you have -- he's never asked for them back --

20   A.  No.

21   Q.  -- correct?

22          And you've maintained constant possession and

23   control of those firearms within your home, correct?

24   A.  They're currently in my home.

25          MS. HODDE:  Your Honor, I think those are my

1    questions for Dan Slaeker.

2              Thank you, Mr. Slaeker.

3              THE COURT:  Thank you.  Oh, Ms. Moore.  I keep

4    calling you "Ms. Moore."

5              MS. KEARNEY:  That's fine.  I'm a poor substitute

6    for Ms. Moore.  Kearney.

7              THE COURT:  So you're in the Southern District,

8    and she is in the Eastern District.

9              MS. KEARNEY:  We've overcome our rivalry, Your

10   Honor.

11             THE COURT:  It's taken decades.  Decades and

12   decades, if you know the history.  I've known several --

13             MS. KEARNEY:  Well, it may help that we live in

14   different boroughs, and so we've overcome that.

15             THE COURT:  How long have you been in the Southern

16   District?

17             MS. KEARNEY:  Almost eight years.

18             THE COURT:  How long?

19             MS. KEARNEY:  Almost eight years.

20             THE COURT:  Oh, goodness.  If you don't mind me

21   interrupting, so you know my friend Berman --

22             MS. KEARNEY:  I do, I do.

23             THE COURT:  -- and Audrey --

24             MS. KEARNEY:  I heard he's got a book out.

25             THE COURT:  I've heard he's got a book out, too.

```
 1                   Audrey Strauss and Geoff Berman and I --
 2          MS. KEARNEY:  They're both lovely.
 3          THE COURT:  -- we worked on the Iran prosecution,
 4     the Iran-contra prosecution together a long, long time ago.
 5          MS. KEARNEY:  That's great.
 6          THE COURT:  He was like straight out of law
 7     school, I think, at the time.
 8          MS. KEARNEY:  Well, he's done well for himself.
 9          THE COURT:  And courageously, too.
10          Anyway, I didn't mean to interrupt you.
11          MS. KEARNEY:  No.  Thank you, Your Honor.
12                         CROSS-EXAMINATION
13     BY MS. KEARNEY:
14     Q.  Mr. Slaeker, I think you testified that your son
15     transferred five firearms to you shortly after his arrest.
16     A.  Yes.
17     Q.  Is there any reason why you are not permitted to have
18     those firearms?
19     A.  No.
20     Q.  Is there any reason why you wouldn't be able to provide
21     documentation of the fact that you have those firearms?
22     A.  No.
23     Q.  Are you aware that your son has not provided
24     documentation to pretrial that you have those firearms?
25     A.  I am as of this day today, yes.
```

1    Q.  Okay.  Can you think of any reason why he would not

2    provide that documentation?

3    A.  No.

4              MS. KEARNEY:  No further questions.

5              THE COURT:  But if somebody provided you with a

6    document, you could go home and list them?

7              THE WITNESS:  Sure.

8              THE COURT:  Particular kinds of firearms and

9    serial numbers or whatever?

10             THE WITNESS:  Yes.

11             THE COURT:  And then your son might have to -- I

12   don't know what the form looks like -- might himself have to

13   sign it and say these are the ones that he gave to you and

14   that sort of thing.

15             THE WITNESS:  Right.

16   BY MS. KEARNEY:

17   Q.  Did he ever ask you to -- I mean, put it this way, you

18   said, you know, that you don't know the details but you know

19   the basics, right?  The kind of firearm they are but not

20   necessarily the brand or the model?

21   A.  Right.

22   Q.  Safe to say that your son does know the brand and model?

23   A.  Yes.

24   Q.  And if for some reason he did not, is that something you

25   could look up?

1    A.  Yes.

2    Q.  And could you have looked that up in October of 2021?

3    A.  Yes.

4          THE COURT:  He could have, but nobody asked him to

5    apparently.

6    Q.  Did anyone ask you to?

7    A.  No.

8          MS. KEARNEY:  No further questions.  Thank you.

9          THE COURT:  Anything else?

10                    REDIRECT EXAMINATION

11   BY MS. HODDE:

12   Q.  Are you aware of the conversation that Mr. Slaeker had

13   with his counsel where his counsel, Ms. Wellman, advised him

14   that he did not need to provide the details about the

15   firearms, simply that they were transferred?  Are you aware

16   that that conversation occurred?

17   A.  Yes.

18          MS. HODDE:  Your Honor, I think they're -- you

19   know, every lawyer does things a little differently.  I tend

20   to be -- I'm the CJA panel rep for my district.  I tend to

21   be very protective of my U.S. probation officers.  And had I

22   represented Mr. Slaeker in the moment this might have all

23   been done a little differently.

24          And I will just say to the Court, I'm happy to

25   coordinate and get -- file an affidavit, if you'd like me

1    to, or whatever would be helpful to the Court or probation.

2    I can get Mr. Slaeker to take photos of the serial numbers

3    or whatever needs to be done, and we can make that as

4    compliant as would be helpful.

5              THE COURT:  Okay.  Well, first, I think photos is

6    a good idea.  An affidavit might be a good idea.  And then

7    after we adjourn here maybe you could talk with Ms. Gavito

8    and Ms. Schuck about whether they want an affidavit or, in

9    addition to the affidavit, whether they still all want the

10   document.  I don't know whose requirement the documentation

11   is, whether it's probation's or pretrial or whatever.

12             There was some form of a document that has been

13   reported.  It was only partially filled out at some point.

14             MS. HODDE:  Okay.  I can try to do that, but what

15   I would propose, just for the Court's edification, I would

16   propose coordinating with Mr. Slaeker, Mr. Dan Slaeker,

17   getting photographs.  I can file a notice with the Court on

18   the record that attaches a declaration by Dan Slaeker and

19   attaches the photos as exhibits so that it's all very clear

20   on the record, if that would be helpful, or if I can just

21   provide it to probation.  Whatever -- I'll take my

22   direction.

23             THE COURT:  You can put it on the record, I guess.

24   But the other thing -- and this is what I want you to talk

25   to Ms. Gavito and Ms. Schuck about -- I think whatever

 1   document -- it's a form document.  Maybe pretrial -- I'm not

 2   sure, but I think we also -- he will -- Mr. Dan Slaeker will

 3   provide photographs and a list of what he has and an

 4   affidavit or whatever that this is what his son gave him.

 5   But if there's also a document that either in the Pretrial

 6   Services world or in the probation world requires a

 7   signature of a defendant, then I think we will need that in

 8   addition to whatever Mr. Dan Slaeker provides.  They can

 9   both stay a few minutes when we're done here.

10              MS. HODDE:  I'm unfamiliar with that document.

11              THE COURT:  So am I.

12              MS. HODDE:  But I will say that we'll execute

13   whatever we need to execute and take care of that promptly.

14              THE COURT:  Okay.

15              MS. HODDE:  Thank you, Your Honor.

16              THE COURT:  Thank you, Mr. Slaeker.  You can step

17   down.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  Do you want to call Mrs. Slaeker as

20   well?  It may be redundant.

21              MS. HODDE:  It would be entirely redundant, so I

22   would propose that we don't unless the Court just wants to

23   hear from her.

24              THE COURT:  Ms. Kearney, do you want to hear from

25   her?

1        MS. KEARNEY:  I don't see a reason.

2        THE COURT:  I think what I would like to do is

3   let's cross all the Is -- or rather cross all the Ts and dot

4   all the Is that we probably should have done before and

5   which have given me and Ms. Schuck, in particular, and her

6   office, as well as probation, concerns, and that we then get

7   everything docketed, filed, et cetera.

8        And if probation needs to do an addendum to its

9   report, they can.  Ms. Schuck can do a Pretrial Services

10  report once all that is done and shortly before our next

11  hearing, and then we'll come back.

12       Now, I know it's an imposition.  I don't know

13  whether Mr. and Mrs. Dan Slaeker need to come back or want

14  to come back from Washington state now that this issue will

15  be -- will have been resolved for the sentencing.  They may,

16  if they'd like to, obviously.

17       But Mr. Slaeker and perhaps Mrs. Slaeker and you,

18  Ms. Hodde, will come back from Tennessee, and Ms. Kearney

19  will come back from the Southern District.

20       So it will take a little while to get all this

21  done, and we've got the holidays coming.  I think it will

22  all be -- I think it would be in everybody's interest if we

23  don't go forward with a sentencing today until we get these

24  things resolved because, once those issues are put aside,

25  then I think you can focus more, Ms. Hodde, on the issues

1    that you want me to focus on rather than the ones that I

2    was -- that I and pretrial and probation were deeply

3    concerned about in view of the history.

4            And I may still be.  But I think we will get a lot

5    of it behind us hopefully, and then we can go forward to

6    sentencing.

7            I've heard part of the argument today.

8    Ms. Kearney can make additional arguments, but then we'll go

9    forward.

10           Now, so that will all take a little bit of time,

11   and we also have the holidays, and Ms. Hodde always has a

12   busy trial schedule; so I'm assuming we would do this after

13   the first of the year.  And I'm not saying that the Southern

14   District isn't also busy.

15           So do we have dates the week of January 9th that

16   are available to anybody or the week of January 23rd?  I

17   think -- I could do it -- there are certain times of the

18   week of the 16th and 17th I could do it also, but that's a

19   less good week.  The 9th and the 23rd are better weeks.

20           MS. KEARNEY:  Your Honor, I will be on trial in

21   front of Judge Mehta the 17th and 18th of January.

22           THE COURT:  You'll be on trial what?

23           MS. KEARNEY:  In front of Judge Mehta.

24           THE COURT:  For only two days?

25           MS. KEARNEY:  It's a bench trial, so we're hoping

1     to move quick.

2               THE COURT:  He'll be happy considering the last

3     one.

4               MS. KEARNEY:  I also think he only has two days,

5     Your Honor.

6               THE COURT:  So you would prefer the week of the

7     9th or the week of the 23rd, it sounds like?

8               MS. KEARNEY:  That's correct.  I think -- I know

9     Ms. Moore is starting a trial shortly.  I think between the

10    two of us we can probably make whatever date works for the

11    Court work, but just so that the Court is aware.

12              MS. HODDE:  The week of the 9th -- the 9th itself

13    is bad for me.  I've got a witness in grand jury in another

14    district.  And -- but the remainder of that week is fairly

15    decent, if that week works.  I don't want to put my esteemed

16    colleague to task.

17              THE COURT:  It looks like I can do it the 10th

18    easily and the afternoon of the -- any time afternoon on the

19    12th or the morning of the 13th.  But the 10th and the

20    afternoon of the 12th are the best for me.

21              MS. HODDE:  I see that I do have a pretrial

22    conference in Nashville at 4:00 on the 12th, so the 12th is

23    going to be hard for me.

24              THE COURT:  So how's the 10th?

25              MS. HODDE:  Well, I will be in grand jury all day

1   the day before so it may be hard for me to get -- I'll have

2   to try to find a way to get here that night.

3             THE COURT:  What city are you going to be in?

4             MS. HODDE:  I'll be in Jackson, Tennessee, which

5   doesn't have an airport.  It's about three hours from

6   Nashville, so it's just a challenge.

7             I apologize to the Court.  My calendar is --

8             THE COURT:  I've got the 10th all day.  The 11th

9   I'm tied up all day with a hearing.  The 12th or the morning

10  of the 13th?

11            MS. HODDE:  I could do the morning of the 13th.

12  My pretrial conference on the 12th is in Nashville, so I can

13  get here pretty easily from there.  I can do the 13th.

14            MS. KEARNEY:  That's fine.

15            MS. HODDE:  The 13th would work fine.

16            I don't know if that -- I know the Court will want

17  a home inspection.  Will the Court want a home inspection

18  between now and then as well?  I'm assuming that the

19  Pretrial Services office will coordinate that.

20            THE COURT:  Yes, why don't we do that, include

21  that in the list of things to do.

22            MS. HODDE:  I assumed that that would be a good

23  idea, to check that box.

24            THE COURT:  So we're going to say January 13th

25  at -- you're going to come in the night before anyway,

1   right?

2               MS. HODDE:  Yes.

3               THE COURT:  So we could do it at 9:00 or 9:30.

4               You're going to be here the night before, too?

5               MS. KEARNEY:  That's fine.  I'll probably be here

6   the week -- that whole week anyway.

7               THE COURT:  Okay.  I'm going to say 9:30 on the

8   13th.

9               Okay.  Well, I think this -- I think in the long

10  run, Ms. Hodde -- even though I know you all were planning

11  on a sentencing today, I think that in the long run this is

12  going to be -- without suggesting what I'm going to do with

13  respect to sentencing, putting these issues behind us will

14  inure to Mr. Slaeker's benefit.

15              So sorry it's taking so long and that we can't get

16  to sentencing today, but I think it makes sense.

17              All right.  So we'll see you all in January.

18  Everybody have a good holiday.

19                        (Whereupon the hearing was

20                         concluded at 10:40 a.m.)

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8          Dated this 3rd day of January, 2023.

9

10                                    <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                      Official Court Reporter
11                                    United States Courthouse
                                      Room 6718
12                                    333 Constitution Avenue, NW
                                      Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25